UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 17-217 |
| v. | * | SECTION: "H" |
| DAVID TRAN '78 | * | |
| | * | |

\* \* \*

### FACTUAL BASIS

The defendant, **DAVID TRAN '78**, has agreed to plead guilty as charged to Count One, Count Two, Count Three, and Count Four of the four-count superseding indictment. Count One charges conspiring to manufacture, distribute, and possess with the intent to distribute one thousand (1,000) or more marijuana plants, four hundred (400) grams or more of a fentanyl, five hundred (500) grams or more of methamphetamine, and one hundred (100) grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846. Count Two charges possession with the intent to distribute four hundred (400) grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Count Three charges possession with the intent to distribute five hundred (500) grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Count Four charges the manufacture of one hundred (100) or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Should this matter have gone to trial, the government would have proven, through the introduction of competent testimony and other admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the superseding indictment:

The defendant, **DAVID TRAN '78**, came to the attention of law enforcement after being intercepted during a court-authorized wire interception in the summer of 2017. **DAVID TRAN '78** was intercepted talking to Nathaniel LOUIS, who is a co-conspirator indicted in E.D. La. Criminal Case No. 17-244, and David TRAN '86, who is the co-defendant in this case.[1] The intercepted calls and texts revealed that DAVID TRAN '86 and **David TRAN '78** worked together to supply LOUIS with heroin.

During the wire intercept of LOUIS's phone, agents heard calls in which LOUIS purchased from ½ ounce quantities up to more than four ounces of heroin from **David TRAN '78** and David TRAN '86. Four ounces is more than 100 grams. For example, agents intercepted several calls related to a deal where **David TRAN '78** and David TRAN '86 supplied LOUIS with heroin to serve a customer who had $10,000. In a call intercepted on July 22, 2017, LOUIS asked **David TRAN '78**, "I can talk on this phone?" He said yes. As the conversation continued, LOUIS informed **David TRAN '78** that he (LOUIS) had an unidentified customer who wanted to purchase approximately four ounces of heroin for $10,000. LOUIS told **TRAN '78** that he needed **TRAN '78** to supply him with one and one quarter ounces (1 ¼ oz.) of heroin in order to fulfill the unidentified customer's heroin order. LOUIS articulated this to **TRAN '78** by saying, "Listen, I got a nigga (customer) got ten ($10,000) … what I just need from you … uhm, a ounce and a quarter and I'ma pay you for that." **TRAN '78** had LOUIS repeat the order and LOUIS said "I said I got a sale … a nigga got ten geez ($10,000), he want four (four ounces of heroin) … but I just need a ounce and a quarter from you … but I'm a need you to bring it right now." **David TRAN '78** asked, "a ounce and a quarter?"

---

[1] Both David TRANs have the same name and no middle initial. They are referenced by the year of their birth, respectively 1978 and 1986.



About an hour later, in another intercepted call, **TRAN '78** asked LOUIS "Where you at?" LOUIS told **TRAN '78**, "This fucking traffic going slow... I'm about to pull up though." **TRAN '78** said, "Alright," and the call ended.

In another intercepted call that same day around 5 p.m., **TRAN '78** and LOUIS discussed a separate transaction. LOUIS articulated his heroin order to **David TRAN '78** by saying, "I need mine man ... I'm out you know ... just bring me mine ... my usual ... my fifteen." The reference to his "usual" purchase amount is indicative of an ongoing conspiratorial relationship. **David TRAN '78** agreed to deliver fifteen grams of heroin to LOUIS by saying, "Alright," and the call ended shortly after. About an hour later, **TRAN '78** called LOUIS and said "I'm outside."

In another intercepted call later that evening, LOUIS spoke to David TRAN '86, who was identified during the wire taps as an associate of **David TRAN '78**. During the intercepted conversation, David TRAN '86 revealed that he had knowledge of the heroin transaction for 1 ¼ ounces of heroin that took place between **David TRAN '78** and LOUIS earlier that day. LOUIS began to explain the problem with the four ounce heroin transaction by saying, "Yeah the nigga talking about his money ...this what I was going to do though I'll let you make the money and whatever I had got today ... I'll pay you for it." While the earlier calls indicated that LOUIS had requested 1 ¼ ounces of heroin from **David TRAN '78** in order to fulfill the four ounce heroin transaction, during this call LOUIS revealed that he actually accepted two ounces of heroin from **TRAN '78** when he told TRAN '86, "I took what ... two ounces so I'ma owe you for two ounces." As the same July 22, 2017 intercepted conversation continued, LOUIS explained that his misrepresentation of the potency of the heroin was the reason the customer wanted a refund. LOUIS explained this to TRAN '86 by saying, "He said the shit I gave him, it's taking a one but I



3

told him it was taking a two… but I know the shit you got really doing that … its taking a two!" LOUIS proposed to remedy the problem by delivering a new four-ounce supply of heroin to the unidentified customer that was capable of being diluted at a 2:1 ratio. LOUIS said, "I'ma tell him … I'ma bring him uhm … know what, he gonna want a sample … and I'ma tell him, you know, let him put a two on that … I'ma make it like you brought me the wrong thing." After LOUIS set out his plan, TRAN '86 asked LOUIS, "So how much you want me to bring?" LOUIS told TRAN '86, "You going to have to bring three and we going to have to put one together … we going to have to put one with it." At the conclusion of this conversation, LOUIS explained he would be give TRAN '86 the $10,000 from the unidentified customer and then owe him another $5,000: "You bringing me three (ounces) that's for nine ($9,000) … you gonna have ten thousand … plus what you gave me earlier (two ounces) I'ma owe you for that ($6,000)." LOUIS received a total of five ounces of heroin from **David TRAN '78** and David TRAN '86 on July 22, 2017, for a total price of $15,000 ($3,000 per ounce).

Agents were able to conduct surveillance operations in conjunction with the wire intercepts, including one in which they observed **David TRAN '78** and David TRAN '86 meeting with LOUIS to exchange money for a heroin debt that LOUIS owed to **David TRAN '78** and David TRAN '86. The wire intercepts made clear the meeting was to exchange money for a drug debt. Agents photographed **TRAN '78**, TRAN '86, and LOUIS during the meeting.

Agents eventually began intercepting **David TRAN '78**'s telephone. In one text message exchange, **TRAN '78** informed LOUIS that **TRAN '78** had been out of town and was returning with a supply of narcotics:

LOUIS: Im going to hit yall today. Ive been in a jam

>    **TRAN '78**: Well bro that all u need to say u we here to help u.  I'm out of town now be back 2 nite
>
>    LOUIS: Ok
>
>    **TRAN '78**: Bro we gone eat when I get back

Location information from **TRAN '78**'s phone showed that he had been in Houston, Texas.

Information learned over the intercept of **David TRAN '78's** phone indicated that **TRAN '78** acquired a warehouse located at 2200 Bridge City Avenue, Bridge City, Louisiana in which **TRAN '78** established a large-scale, indoor marijuana cultivation operation.  Further information revealed that **TRAN '78** also acquired a residence located at 2208 Bridge City Avenue, Bridge City, Louisiana, which is directly adjacent to the warehouse, in order to remain in close proximity to, as well as oversee, the indoor marijuana grow.

For example, on August 26, 2017, the intercept captured a conversation between **TRAN '78** and a known criminal associate during which **TRAN '78** informed him that he was in the process of renovating the warehouse to accommodate the cultivation of hundreds of marijuana plants by saying, "… I working on my little warehouse down here…" and that he planned to use "forty to fifty lights" to supply the abundance of artificial light source needed to enhance the growth of the marijuana plants.  **TRAN '78** informed the known criminal associate that he learned to cultivate marijuana plants while he lived in Denver, Colorado by saying, " … I was in Denver for a whole year … I moved back down here … I'm about to do that shit down here."

On September 5, 2017, the wire and electronic intercept captured a call in which **TRAN '78** said he was "fixing my warehouse (2200 Bridge City Avenue, Bridge City, Louisiana)…building the rooms…I had to fix the house (2208 Bridge City Avenue, Bridge City, Louisiana) for the boys…so he can live in it and watch the warehouse too."  The reference to

5



"boys" and "he" was to TRAN '86, who lived at the adjacent house and tended to the marijuana grow. On September 6, 2017, **TRAN '78** told another associate that "…I have to paint and run electrical wire…I planned for two levels…I intend to build two rooms, one room is done…upstairs I 'veg' (grow) but downstairs I use to make 'flowers' (a mature marijuana plant), you know…just steal the electricity, I don't turn power on or anything on." In further describing the warehouse, **TRAN '78** added, "It is still vacant. It used to be a store but its' been shut down for many years." The marijuana grow took place in a building that used to be a store.

On September 13, 2017, **TRAN '78** told another associate, "I finished the warehouse in two weeks, I moved everything in already. All four rooms have plants, I put almost eight hundred plants…I harvest the first week, or second week of December…" During another intercepted conversation between **TRAN '78** and one of his known associates, on October 4, 2017, **TRAN '78** re-iterated the success of his marijuana cultivation inside of the warehouse by saying, "Over here…mine is about seven, eight hundred plants…" and that **TRAN '78** planned to "finish by December…re-load…" and plant "all new plants." This call was significant because it showed that the conspiracy to grow marijuana involved not just the plants seized during the search, but an ongoing plan to grow many more plants. That the conspiracy involved more than a 1,000 plants was further shown by the vast amount of growing materials seized during the search, which included thousands of growing trays and other materials.

On several occasions during this investigation, agents observed **TRAN '78** leave the residence at 2208 Bridge City Avenue, Bridge City, Louisiana in a silver, 2005 Toyota 4-Runner. Following the expiration of the wire and electronic intercepts, agents continued to conduct periodic surveillance of **TRAN '78** and continued to observe his silver Toyota 4-Runner parked at 2208

Bridge City Avenue, Bridge City, Louisiana on numerous occasions.

On November 7, 2017, Agents/Officers of the DEA New Orleans Field Division, along with officers of the Jefferson Parish Sheriff's Office, executed a search warrant at the above-referenced warehouse and residence in Bridge City. During the course of the search, agents located over 500 marijuana plants being grown in the warehouse at 2200 Bridge City Avenue.

**David TRAN '78** and David TRAN '86 were both at the residence at 2208 Bridge City Avenue, which shares a common parcel with the warehouse with direct accessibility between the residence and the warehouse. After initially refusing to speak with law enforcement, TRAN '86, after watching law enforcement remove the plants from the warehouse, told an officer that he had spent approximately $100,000 readying this location for the marijuana grown. TRAN '86 explained that he had previously been arrested in Texas on charges related to growing marijuana. TRAN '86 explained he stayed in jail for a month on those charges and then bonded out. He said he was convicted of the Texas charges. TRAN '86 denied that **TRAN '78** was involved in the marijuana grow operation and stated that he was the "brains of the operation."

TRAN '86's denial of **TRAN '78**'s involvement with the marijuana grow is inconsistent with the wiretap evidence. The calls discussed above demonstrate that **TRAN '78** was very involved in selecting and outfitting/modifying the warehouse to convert it to a marijuana grow location. Further, agents have surveilled **David TRAN '78** and David TRAN '86 together and followed them to the residence adjacent to the warehouse where the grow was taking place.

Large-scale marijuana cultivation operations require nearly constant maintenance and supervision. Neither **David TRAN '78** nor David TRAN '86 have a job. This allowed them the time necessary to tend to the marijuana plants, whose full growth cycle, from the initial stages

7

of seeding or cloning through the flowing stage prior to harvesting, can last several months.

In addition to the marijuana plants, agents discovered in the warehouse a safe that contained distribution quantities of fentanyl, methamphetamine, and ecstasy pills. The ecstasy pills were in a box on which someone had written, "return to sender." During the wire intercept of **TRAN '78**'s phone, agents had intercepted calls talking about getting a shipment of pills and writing "return to sender" on the box in case law enforcement was observing the deliver. A DEA chemist would testify that the various packages of seized drugs were analyzed and found to be: 1,396.2 grams of a substance containing methamphetamine; ~~990 grams of a substance containing MDMA (ecstasy)~~ [DEA RJ D.7]; 856.8 grams of fentanyl; 214 grams of fentanyl; 51.4 grams of fentanyl; and 53.7 grams of fentanyl. **David TRAN '78** and David TRAN '86 jointly possessed these drugs. The quantities are consistent with distribution and not personal use.

The government would also have presented evidence under Rule 404(b) of the Federal Rules of Evidence related to a prior incident in Texas in which **David TRAN '78** and David TRAN '86 were arrested after being found at a marijuana grow and charged with marijuana cultivation. During that incident, officers also seized a large amount of ecstasy.

DW
D.T
R.J.

The limited purpose of this factual basis is to satisfy the Court that there is a sufficient basis in fact for **David TRAN '78** guilty plea. This document does not contain all information known to the government about the charged conspiracy to distribute heroin.

_____ 2/10/2020
David Haller                    Date
Assistant United States Attorney

_____ 2/10/20
~~Stephen Shapiro~~              Date
Attorney for DEFENDANT
ROBERT JENKINS

_____ 2/10/2020
David Tran '78                   Date
Defendant

DT
RrJ.